## Case No. 16,373.

### UNITED STATES v. STAHL.

[1 Woolw. 192; [1] McCahon, 206; 1 Kan. 606.]

Circuit Court, D. Kansas. May Term, 1868.

FEDERAL JURISDICTION IN KANSAS — ESTABLISHMENT OF FORT ON GOVERNMENT LAND—WITHDRAWAL OF JURISDICTION FROM STATE.

1. The United States, when it admitted Kansas into the Union, although retaining the title

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]

to the land which it then owned within the state, parted with the jurisdiction over it, so far as the general purposes of government are concerned, with certain reservations and exceptions.

[Cited in Marion v. State, 16 Neb. 358, 20 N. W. 293; County of Cherry v. Thacher, 32 Neb. 353, 49 N. W. 352; State v. Doxtater, 47 Wis. 294, 2 N. W. 449.]

2. These reservations and exceptions were (1) Lands of Indian tribes having treaties with the United States, which exempt them from state jurisdiction. (2) The right to tax lands of the United States, and of Indians.

3. Forts of the United States might have been, but were not excepted.

4. In respect of jurisdiction within forts, Kansas is on the same footing as the original states. Her consent is necessary to the exercise by the United States of jurisdiction within them.

[Cited in Ex parte Hebard, Case No. 6,312; Langford v. Monteith, 102 U. S. 146.]

[Cited in State v. McKenney, 18 Nev. 182, 2 Pac. 172.]

5. Whether the constitution requires the consent of the state in which it is located, as a condition precedent to the establishment and use as a fort of a place already belonging to the United States, may be doubted.

6. In order to withdraw from a state a jurisdiction which it has once exercised, and confer it on the general government, the consent of the former is a pre-requisite. This is the material point aimed at in the constitution.

[Cited in U. S. v. Sa-coo-da-cot, Case No. 16,212.]

7. Fort Harker was, in 1863, established as a military post on government land in Kansas, and the United States has always retained the fee. In 1861, Kansas was admitted into the Union on an equal footing with the original states, with boundaries which included the lands on which the fort was established. Held, that the fort is not within the jurisdiction of the federal courts, to punish the crime of murder committed therein.

[Cited in Nebraska v. Pollock, Case No. 10,077.]

[Cited in Burgess v. Territory, 8 Mont. 57, 19 Pac. 562.]

This was a demurrer to a plea to the jurisdiction of the court.

MILLER, Circuit Justice. In this case the defendant is indicted for murder, alleged in the bill to have been committed in the district of Kansas, at a place under the sole and exclusive jurisdiction of the United States of America; to wit, at Fort Harker, on land occupied by the United States for a military post, and purposes connected therewith. To this indictment, the defendant pleads to the jurisdiction of the court, alleging that Fort Harker was first established as a military post in the year 1863, under the authority of the war department; that no purchase of the land on which it was established had ever been made by the government of the United States with the assent of the state of Kansas; and that the consent of that state had never been given in any other mode to the exercise by the federal government of an exclusive jurisdiction over the land included within the post. To this plea there is a demurrer, which we are now to decide.

The state of Kansas was admitted into the

Union by an act of congress, approved January 29, 1861 (12 Stat. 126), which declared that she was thereby placed on an "equal footing with the original states in all respects." This act, after describing the boundaries of the new state, excepts from its jurisdiction any territory which, by treaty with Indian tribes, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory, and declares that it shall not be included within said state. In the case of U. S. v. Ward [Case No. 16,639], decided at the May term, A. D. 1863, this court held that the jurisdiction of the state over the crime of murder was exclusive of that of the federal government, although the offence was committed on soil to which the Indian title had not been extinguished, unless it was soil occupied by one of the tribes which had treaties with the United States of the character above described. We held that the state had no jurisdiction in such territory, because it was no part of the state. It is not claimed that Fort Harker is included within territory of the character last mentioned. Here it is insisted that because the fee of the soil was in the United States when the fort was established, and because the federal government continued in the use and occupation of such soil as a fort, therefore the right to exercise jurisdiction in case of murder committed there vests in the United States.

It needs no argument to show that the jurisdiction of the crime of murder, or of any other offence, committed within the limits of her territory, must belong to the state of Kansas, except in some special cases, which, by a positive rule of law, are constituted exceptions to the general principle. In this case the exception is claimed to rest on that provision of the federal constitution which empowers congress "to exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may, by session of particular states and the acceptance of congress, become the seat of government of the United States, and to exercise like authority over all places purchased, by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."

It is very obvious that the situs of Fort Harker does not come within the literal sense of this provision; for it was not purchased by the United States at all, and no consent was ever given by the state legislature to its use as a fort. As the United States was already the owner of the land before the establishment of the fort upon it, and before Kansas was organized into a territory or admitted as a state, it was impossible to comply with these literal terms of the constitution, so far as the purchase was concerned. But as no purchase could be made, so none was necessary. The only object of a purchase, namely, the acquisition of a title, was already

accomplished. The government of the United States, when it admitted Kansas into the Union upon the same footing as the original states, retained the legal title to all the lands which it then owned in the state of Kansas. So far as general purposes of government were concerned, however, with certain reservations and exceptions, it parted with jurisdiction over it.

The first exception reserved the lands of Indian tribes which had treaties exempting them from state jurisdiction; the second, the power to tax the lands of the United States and of the Indians. It was competent to the federal government, and it would have been appropriate at that time, to have also excepted out of this grant of jurisdiction, places for forts, arsenals, &c., if such had been the policy of congress. But it was not done. So far as the consent of Kansas to the exercise of this exclusive jurisdiction by congress is concerned, that state stands on the same footing as the original thirteen.

The question then is, when congress purchases the fee simple of a portion of territory included within one of the original states, for the purpose of erecting a fort thereon, what kind of consent is necessary to be obtained from the state legislature in order to vest jurisdiction in the federal government? It is not material now to inquire whether the United States could erect and occupy a fort without the consent of the legislature. The language is, that congress shall exercise exclusive legislation over all places purchased with that consent. But whether the constitution requires that consent as a condition precedent to the establishment and use of the place as a fort, may well be doubted. It does not seem probable that the framers of the constitution, who conferred on congress full powers of making war, raising armies, and suppressing insurrections, and also declared that the federal government was established for the express purpose of providing for the common defence, would have left its power of erecting forts, so important to the execution of that purpose, subject to the volition of state legislatures. However this may be, it is clear that in order to withdraw from a state a jurisdiction which it had possessed and exercised, and confer it on the general government, the consent of the former was made a prerequisite. This is the material point aimed at by the provision of the constitution.

All the important uses of a fort, arsenal, or magazine could be secured without the exercise of exclusive legislation within their walls; and there was manifest propriety in requiring the assent of the state to the exercise of this important and delicate power, which of right belonged to the local authority, and which could be needed by or useful to the general government only in special cases. This jurisdiction having been vested in the state of Kansas by the act admitting her into the Union, and never divested, it cannot now belong to the United States. The power provid-

ed for in the constitution is one of exclusive legislation. The act under which the defendant is indicted applies, in exact terms, to places only in which the United States is empowered with exclusive legislation. More-over, the indictment describes the place as being within the exclusive jurisdiction of the federal government. The question of concurrent jurisdiction, therefore, does not, and cannot arise in this case.

[These views find support in the following adjudged cases: People v. Godfrey, 17 Johns. 225; Com. v. Clary, 8 Mass. 75; U. S. v. Bereau, 3 Wheat. [16 U. S.] 388; Clay v. State, 4 Kan. 49; Dunn v. Games [Case No. 4,176]; Story, Const. §§ 1224–1227; 1 Kent, Comm. 482.] [2]

The demurrer to the defendant's plea to jurisdiction is overruled.