THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ELIGIO SUÁREZ, Defendant and Appellant.

No. 6592. Argued June 22, 1937.—Decided July 13, 1937.

*Abelardo Casanova Prats* for appellant. *R. A. Gómez, Prosecuting Attorney,* for appellee.

Mr. Justice Travieso delivered the opinion of the court.

Eligio Suárez was accused and convicted of a violation of section 11 of Act No. 67 of May 13, 1934 (Session Laws, p. 458), entitled "An Act to regulate the manufacture, possession, storage, transportation, sale or gift of explosives in Puerto Rico, defining offenses, prescribing penalties, declaring an emergency, and for other purposes." The offense charged is described in the information, thus:

"The said defendant, Eligio Suárez, on or about one day in July, 1935, in the Municipality of San Juan, Puerto Rico, which forms part of the Judicial District of San Juan, did unlawfully use dynamite and some other explosive, unknown to the undersigned District Attorney, for the purpose of damaging and destroying the building used as a post office in Puerta de Tierra."

Feeling aggrieved by the sentence of three years in jail at hard labor imposed on him, the accused took the present appeal; and in support thereof he has charged the lower court with the commission of eleven errors. We will proceed to consider them in the same order in which they have been assigned.

1. That the District Court of San Juan erred in taking cognizance of the case.

The appellant maintains that the jurisdiction in this case corresponds exclusively to the United States District Court for the District of Puerto Rico, as a federal building is involved; that even if the insular courts should have jurisdiction of such cases, the evidence herein does not show that the alleged offense was committed within the jurisdiction of the District Court of San Juan; and that the law on which the information is based is unconstitutional because it contains more than one subject under the same title.

■■ The evidence offered by the prosecution established beyond a reasonable doubt that "the building occupied by the post office of Puerta de Tierra," which is the place where the criminal acts with which the accused is charged were committed, is situated at Stop 5½, at the corner of Ponce de León Avenue and Padre Hoff Street, in the ward of Puerta de Tierra. This court takes judicial notice that the ward of Puerta de Tierra is comprised within the jurisdictional limits of the District Court of San Juan.

■■ The statute (Act No. 67 of 1934) defines the crime with which the appellant is charged as follows:

"Section 11.—*Unlawful use; punishment.*—Any person unlawfully using dynamite or other explosive for the purpose of inflicting bodily injury upon, or to terrify and frighten any person, or to injure or destroy any property, or to damage the same in any manner, shall be liable, etc."

The information in the instant case conforms to the language of the statute and is sufficient to inform the accused

of the nature of the offense with which he is charged. The words "the building occupied by the post office of Puerta de Tierra," do not charge the accused with the commission of a federal offense. Those words have been included in the information in order to better describe and identify the property which it is alleged the accused attempted to destroy illegally. The information would be equally sufficient if it charged the accused with the intent to destroy "the building located at the corner of Ponce de León Avenue and Padre Hoff Street." All that the statute requires is that the explosive be used for the purpose of injuring or destroying any property, irrespective of its owner. If the accused raises the question of jurisdiction, alleging that the property which was sought to be destroyed belongs to the People of the United States and that hence the Federal Court has exclusive jurisdiction of the case, it is incumbent upon him to prove such allegation.

The appellant in his brief says: "It has been decided by the courts of the United States that it is presumed that when the Federal Government occupies lands or buildings for governmental purposes, such lands or buildings are the property of the Federal Government, and hence, the jurisdiction of the Federal Courts is exclusive." But the appellant does not aid us by indicating to us the sources of his information for he does not cite a single authority which supports that doctrine. Although we have made a careful study of the federal decisions on the matter, we have not been able to find any basis to support it.

The States—and the People of Puerto Rico by virtue of its Organic Act—have exclusive jurisdiction to take cognizance of and punish all the crimes committed within their territorial limits. That is the general rule of jurisdiction. It is based, naturally, on the fact that the States are sovereign, with all the powers inherent to sovereignty, whereas the Federal Government is a government of delegated powers,

and can only exercise such powers as have been delegated to it by the States. The exception to the general rule is that established by the Federal Constitution (Article 1, section 8, subdivision 17) in granting to Congress the exclusive legislative power over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, and other needful buildings. When the Federal Government purchases lands for any of said purposes and the State legislature gives its consent, the lands so purchased become *ipso facto* submitted to the exclusive jurisdiction of Congress, and the jurisdiction of the State ceases completely. See *U. S.* v. *Cornell* (C.C.R.I. 1819) 2 Mason 60, 25 Fed. Cases No. 14867.

The jurisprudence we have examined holds:

"'A state retains complete and exclusive political jurisdiction over land within its limits purchased by the United States as a site for a public building, unless such purchase was with the consent of its legislature, or jurisdiction has been otherwise ceded to the United States." *United States* v. *San Francisco Bridge Co.*, 88 F. 891.

In the case of *U. S.* v. *Penn,* 48 Fed. 669, the United States had purchased the Arlington grounds, during the war, at a public sale for delinquent taxes. The State of Virginia had never ceded its jurisdiction over said property. And it was held that the Federal Court did not have jurisdiction over a crime of petty larceny committed in the National Cemetery of said State.

The Federal Supreme Court in *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525, 531, 29 L. Ed. 264, in holding that the State of Kansas had not lost its jurisdiction over the Fort Leavenworth Military Reservation, said:

"The consent of the States to the purchase of lands within them for the special purposes named is, however, essential, under the Constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States,

unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the States equally with the property of private individuals."

See also *U. S.* v. *Cornell,* supra; *Commonwealth* v. *Clary,* 8 Mass. 72; *In re Kelly,* 71 Fed. 545, and cases cited in U. S. C. A., Constitution, pages 440–448.

In *Fort Leavenworth R. R. Co.* v. *Lowe, supra,* the Court said:

"Where, therefore, lands are acquired in any other way by the United States within the limits of a State than by purchase with her consent they will hold the lands subject to this qualification: that if upon them forts, arsenals, or other public buildings, are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the State as would destroy or impair their effective use of the purposes designed. Such is the law with reference to all instrumentalities created by the general government. Their exemption from State control is essential to the independence and sovereign authority of the United States within the sphere of their delegated powers. But, when not used as such instrumentalities, the legislative power of the State over the places acquired will be as full and complete as over any other places within her limits."

The case of *Battle* v. *United States,* 209 U. S. 36, 52 L. Ed. 670, cited by the appellant, is not an authority to support his theory that when the Federal Government occupies a building for the service of mail it must be presumed that said building belongs to said Government, and hence, that the jurisdiction of the federal courts is exclusive. The case cited involved a murder committed *on lands purchased by the United States,* in the city of Macon, State of Georgia, on which a building for a post office and a court of justice had been constructed and *as to which the State of Georgia had ceded its jurisdiction.* The only disputed question in the case

was whether the Congress had power to purchase lands for post offices and courts. And said question was decided as follows:

"There can be no doubt of the power of Congress to purchase land within a State for post offices or courts, by consent of the legislature of the State, and to exercise exclusive legislation over the same. Post offices are among the 'other needful buildings' for the erection of which, as well as of 'forts, magazines, arsenals, dockyards,' *it is assumed that land will be bought*, and for which land has been bought by the Government all over the United States." (Italics ours.)

Section 6 of the Act of February 16, 1903, of our Insular Legislature, does not help the appellant either in his efforts to maintain the alleged presumption of exclusive jurisdiction of the Federal Court over the offense charged against him. By the terms of said section, the People of Puerto Rico, conforming to the doctrine established by the decisions we have cited, ceded exclusive jurisdiction to the United States over the lands which the Federal Government might acquire in the future in Puerto Rico, *by purchase or eminent domain*. The fact, then, that the Federal Government occupies a building as a post office is not in itself sufficient to cause the exclusive jurisdiction of the federal courts to arise as an unavoidable consequence of such mere occupancy. It is necessary that the Federal Government should have purchased or expropriated the building. This fact can not be presumed, it must be proved by the person relying on it. And once it is proved, the federal jurisdiction is established by virtue of said section of the Act of February 16, 1903.

Exclusive jurisdiction is never presumed. He who claims it must prove it. In the instant case, the district attorney alleged that the crime had been committed in the Municipality of San Juan, Puerto Rico, which forms part of the Judicial District of San Juan. And the evidence shows that the building which was sought to be damaged or destroyed is situated within said jurisdiction. As no legal presumption

whatever existed in favor of the federal jurisdiction invoked by the appellant, by the mere fact that there was a post office in the building the district attorney was not bound to prove the negative, that is, that the building did not belong to the United States, by purchase or eminent domain. It was incumbent on the defendant to prove his defense, by showing that the case was included, as an exception, within the federal jurisdiction. The record does not show that the defendant introduced any evidence tending to prove his defense. See *People* v. *Collins,* 105 Cal. 504; *People* v. *Fredericks,* 106 Cal. 554; *United States* v. *Jones,* 109 U. S. 513.

The lower court did not err in assuming jurisdiction.

■ 2. That the lower court erred in not holding that the facts alleged in the information did not constitute a public offense, on the ground that Act No. 67 of May 13, 1934, was unconstitutional and void, especially its section 11.

As a basis for the alleged unconstitutionality, it is urged that the title of said act does not include the illegal "use" of explosives punished by its section 11, thus violating section 34 of our Organic Act, which provides that, "no bill except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title."

In *Cepeda* v. *Lugo,* 50 P.R.R. 364, the same question raised by appellant herein was involved, and we decided it by holding that when the Legislature used the word "possession" in the title of the act it intended to include in the same the "use."

In attempting to overcome the effect of the cited decision, the defendant argues that it was not the intention of the Legislature to include the "use" when speaking of "possession." And in support of his contention he mentions the fact that on May 9, 1936, there was approved Act No. 66 of the Legislature, entitled "An Act to amend, for the purpose of making it conform with section 11, the title of Act No. 67,

approved March 13, 1934, and for other purposes," the first
section of which reads thus:

"Section 1. The title of Act No. 67, approved March 13, 1934,
is hereby amended as follows: 'To regulate the manufacture, use,
possession, storage, transportation, sale or gift of explosives in Puerto
Rico, defining offenses, prescribing penalties, declaring an emergency,
and for other purposes.' '' (Laws of 1936, p. 342.)

The appellant goes on to say that the approval of said
amendment shows "that the original intention of the Legis-
lature was not to include the word 'use' nor to give to the
word 'possession' employed in the act the meaning of 'use' ";
and that "the unavoidable conclusion is that the Legislature
has construed its intention in the same way in which the ap-
pellants contended in the said case (*Cepeda* v. *Lugo, supra*),
and not in the way in which it was interpreted by this Hon-
orable Court." In other words, the appellant maintains that
the Legislature, infringing on the judicial power, has re-
versed the decision of this court.

The arguments of appellant are able but not convincing.

We are not authorized to presume that the Legislature
had the intention attributed to it by the appellant. Before
we could accept that presumption, we would have to admit
that the Legislature did not have the intention of punishing
the use of explosives to destroy or damage property until it
approved Act No. 66 of 1936. In our judgment, the purpose
of the Legislature in enacting that statute was to conform
its legislation to the existing judicial interpretation, thus
avoiding future doubts as to the legislative intention. We
are of opinion that the law, the violation of which is charged
against the appellant, is valid and constitutional, and that
the lower court did not err·in upholding its validity.

3. That the lower court erred in overruling the demurrer
on the ground that the information was insufficient and ambiguous.

We have already decided, when discussing the previous
assignments, that the information conformed to the statute

and contained all the elements necessary to inform the accused as to the nature of the offense charged against him.

The appellant maintains that the information is ambiguous because it states that the defendant used dynamite "and another explosive unknown to the district attorney," and that, as the law punishes the use of certain explosives and does not punish the use of others, the allegation is ambiguous in that it can not be determined thereupon whether or not the explosive unknown to the district attorney was one of those prohibited by the statute.

The transcript of the evidence shows that when the defendant was arraigned, he pleaded not guilty, and did not file any demurrer to the information, the case being thus ready for trial. On April 17, 1936, when the case was called for trial, the defendant filed a demurrer to the complaint and claimed:

"That the facts alleged in the information are insufficient and ambiguous and do not state a public offense."

Neither in the writing filed by the appellant, nor in any part of the record does it appear that the accused specified the alleged ambiguity of the information. It does not appear from the record that the demurrer was submitted without argument. The court did not have an opportunity to know in what the alleged ambiguity consisted.

We hold that the demurrer for ambiguity came too late. The accused should have filed it before pleading to the information or at least at some date prior to that of the trial, so as to give an opportunity to the district attorney to explain or amend any ambiguity which may have existed in the information. And he should have specifically stated the alleged ambiguity, which he now points out for the first time on appeal.

We also think that said ambiguity is nonexistent. The information charges the accused with the use of dynamite, an explosive the use of which is prohibited by law. The

words "another explosive unknown to the district attorney" were not absolutely necessary to complete the description of the offense, and can be considered as surplusage. If the other explosive was not known to the district attorney, he could not be compelled to mention it in the information, and it must be presumed that said explosive was not prohibited by law.

The lower court did not commit the error assigned.

4. That the lower court erred in admitting oral evidence to prove that the building belonged to a private person and was leased by said person for a post office, when that fact should have been proved by documentary evidence, which was the best evidence."

The supposed error lacks importance. And even if one was committed, it could not in any way prejudice the rights of the defendant. The latter was charged with the offense of using explosives to destroy or cause damage to a property situated within the jurisdiction of the court. The district attorney was not bound to prove the ownership of the building, as that fact was immaterial and not a necessary element of the information. If the accused desired to prove that the building belonged to the United States, in order to establish his demurrer for lack of jurisdiction, he had an ample opportunity to do so but failed to take advantage of it.

5. That the lower court erred in refusing to strike from the record the conclusion of the witness Juan Igaravídez that a bomb had exploded in Puerta de Tierra.

After said witness had testified that he knew the defendant by sight and that he had seen him three times, the examination by the district attorney continued as follows:

"Q. On what night did you see him?
"A. The night the bomb exploded in Puerta de Tierra.
"Q. In what part of Puerta de Tierra?
"A. Upon leaving the post office.
"Defense: We request that the reference to the bomb be stricken from the record.

"Judge: We are not before a jury.

"Defense: Exception.

"Q. How do you know that a bomb exploded?

"A. Because as I was going down the alley, as I was passing by 'La Francesa,' I heard the explosion.

"Q. What did you hear?

"A. I saw it explode.

"Q. What was it that exploded?

"A. A big explosion.

"Q. From where did you see that?

"A. I was turning from 'La Francesa' and was rounding by Padre Hoff towards San Agustín 48, where I lived."

There was no error in permitting the above questions. The witness was not giving his opinion as to whether or not the explosion was caused by a bomb. If he referred to a bomb it was to specify the night on which he saw the accused. He was an eyewitness to the fact of an explosion and the court was justified in permitting him to testify as to the facts which he saw. The substantial rights of the parties were not prejudiced in any way, especially, as the court stated, there being involved a case tried by the court without a jury. The attorney for the defense himself, in cross-examining the witnesses for the prosecution and in questioning those of the defense on several occasions asked them where they were when the bomb exploded or when the explosion was heard. And we must presume that he did not do so with the intention of prejudicing his client.

 6, 7, 8, and 9. All of these assignments refer to the alleged insufficiency of the evidence, and charge that the court erred in denying the motion for nonsuit.

We have carefully studied the transcript of the evidence and the findings of fact of the lower court, and we find that the same are amply supported by the evidence. There is no contradiction in the testimony of the witnesses for the prosecution, who fully corroborated each other. There is conflict between the statements of the witnesses for the prosecution and those of the witnesses for the defense, for whilst the

former testified to the presence of the accused at the place of the explosion when the same occurred, the latter attempted to support the defense of alibi set up by the defendant, and they testified that the defendant was at that moment at some other place. The trial court, before which the witnesses appear and testify, is the one invested with power to weigh the evidence, pass upon the credibility of the witnesses and to adjust any conflicts that may arise from their statements. The appellate court should not interfere with the judicial discretion of the lower court unless the latter has committed manifest error or acted under the influence of passion, prejudice, or partiality in weighing the evidence. Such a defect is not urged by the appellant.

The identification of the defendant as the perpetrator of the crime was established by the testimony of two witnesses, the policeman Arístides Ferrer and the citizen Juan Igaravídez, who identified the accused as the person whom they saw come out running from the building and jump on the running board of an automobile which was coming slowly along the highway, at the moment the explosion occurred.

The defense set up by the accused was that of alibi, that is, that he was at another place at the time the crime charged was committed. In order that the defense of alibi be effective, or at least sufficient to create in the mind of the judge a reasonable doubt as to the guilt of the accused, it is necessary that the evidence offered to prove it should exclude the possibility that the accused was present at the scene of the crime when the same was committed. Let us examine the evidence.

The evidence, as a whole, fixes the time when the explosion occurred as between 12:00 and 12:10 o'clock in the evening from July 25 to July 26, 1935. To prove his alibi the accused introduced the following evidence:

Casimiro Rodríguez, who testified that on the night of July 25, he went to visit Attorney Casanova at his house in

the Plaza de Colón in San Juan; that upon going by the Plaza Baldorioty he met Ramón Santana and his brother, Attorney Santana, and they all together went to visit Casanova; that he, the witness, retired at about 10:30 or 10:35 p. m., leaving the accused there.

Ramón Jaime Santana, corroborated the testimony of Casimiro Rodríguez, and testified that the visit to Casanova ended about 11:00 or 11:05 p. m. and that he separated from the defendant Suárez, at San José Street about 11:30 p. m.

Attorney Casanova Prats, counsel for the accussed, testified: "About 10:30 or 10:45 more or less, I do not believe it was 11:00 p. m., they left my house," referring to the accused and to the Santana brothers; that they ordinarily, at times left his house at 11:30 and even at 12:00 p. m., but that that night they insisted on leaving early. And when asked by the judge as to the time they left he answered: "About 10:30 or 11:00 p. m., more or less, about 10:45."

As it may be seen, the above statements do not exclude the possibility of the presence of the accused at the place of the explosion when the same occurred. Even if the trial judge had given full credit to said statements, it was always possible that the accused might have been at the place of the crime at 12:00 or 12:10 o'clock on the same night. Admitting the three statements to be absolutely true, neither of them informs us where was the accused during the time which elapsed from 11:30, when he left the Santana brothers at San José street, and 12:00 or 12:10 when the bomb exploded. The intervening period was more than sufficient to enable the accused to go from San Juan to Puerta de Tierra, commit the crime charged and return to the starting point, for, according to the testimony of one of the witnesses for the defense (Page 60 of the T. of the E.), to go from Stop 5 or 7 in Puerta de Tierra to the garage Las Monjas in San Juan in an automobile, at 30 miles per hour, during the late hours of the night when there is little traffic, it takes about five minutes.

In order to complete the proof of his alibi the defense presented two other witnesses, who testified:

José López Cepero: That he was at his home when the bomb exploded; that a little before, about three or four minutes before, he had left the garage Las Monjas, where he went to leave a car; that he saw the accused in the garage, about three minutes to twelve; that he went home at two minutes to twelve, and it took him about three or four minutes to reach the same, and that at the moment he was opening the entrance door he heard the explosion.

Rafael López: That he is an intimate friend of the accused; that he worked at the garage Las Monjas; that when the bomb exploded the accused was in the garage talking with him; that the accused remained there that night from 11:00 o'clock until after the explosion, until 12:15.

The conflict existing between the testimony of this last witness and that of Santana is to be noted. The latter positively asserted that he, his brother, and the defendant left the house of Attorney Casanova at about 11:00 p. m.; and that he separated from the accused, "about 11:30, more or less." How could the defendant—unless he possesses the virtue of ubiquity—be in the garage Las Monjas, talking with his friend Rafael López, from 11:00 to 12:15, and also be at San José Street, with the Santana brothers, at 11:30?

The witnesses Gutiérrez and Villanueva testified on rebuttal, that they had been in the garage immediately after hearing the explosion and that the accused was not there as the witnesses for the defense had testified; and that the only person there was the watchman Rafael López, who was talking to some person other than the defendant.

The lower court, after summarizing the evidence said:

" . . . . In this case, after seeing and hearing the witnesses testify, comparing and analyzing their statements and considering the interest or prejudice which the witnesses may have had to testify in the manner they did, and considering also that a reasonable doubt must not be a capricious doubt, nor feigned or imagined by the

court with the object of evading the responsibility of imparting justice, we have the moral conviction or certainty that the guilt of the accused has been proved beyond a reasonable doubt.''

The record justifies the conclusions reached by the trial court and we do not feel warranted in altering them.

The appellant in his tenth assignment complains that the sentence of three years in jail imposed on him is excessive. It is not so, in our judgment. If there is any crime which deserves the imposition of a severe penalty it is that of using explosives to terrorize a whole community, putting in danger the life of innocent persons. No matter what the personal or political motive of such a cowardly attempt might be, the author of the same deserves a severe penalty. The appellant in this case can not complain of a sentence which we consider excessively benign.

The judgment appealed from must be affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.